# EXHIBIT A
# Highly Confidential - Filed Under Seal

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CCC INTELLIGENT SOLUTIONS INC., | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | Civil Case No. 1:18-cv-07246 |
| v. | ) | |
| | ) | **Jury Trial Demanded** |
| TRACTABLE, INC., | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |

## COUNTERCLAIMS

Defendant and Counterclaimant Tractable Inc. ("Tractable") brings these antitrust counterclaims for damages, an injunction, and other relief against Plaintiff and Counter-Defendant CCC Intelligent Solutions Inc. ("CCC") and alleges as follows:

## INTRODUCTION

1.      By coercing customers and suppliers into long-term exclusive contracts and blocking or punishing customers for working with technologies other than theirs, CCC has willfully stifled innovation in the market for auto insurance-bodyshop software. This multi-faceted anticompetitive scheme has led to CCC's monopoly and CCC's ability to charge customers prices that are sometimes multiple times more expensive than competing products, because customers are unable to turn to alternative products. CCC and their shareholders have enriched themselves at the expense of everyday Americans, who spend billions a year on auto insurance as a life necessity.

2.      American consumers pay over $360 billion a year to obtain auto insurance. Competition among insurers is fierce, margins are low, and, consequently, inefficiencies in the auto repair process are passed on to consumers in the form of higher prices (*e.g.*, higher premiums, higher deductibles, narrower coverage).

1

3.     Tractable, an award-winning applied AI company, is helping lead the charge to reduce such inefficiencies by applying artificial intelligence to various aspects of the auto insurance claim process, making the process quicker and more cost effective. This, in turn, makes the auto insurance claim process less painful for consumers and reduces the costs of insurance. Outside the U.S., Tractable's clients include many of the largest insurers, and to date it has helped process over $1 billion in auto insurance claims worldwide. Despite this success abroad, in the U.S., Tractable and other companies looking to innovate and improve the auto insurance claims process have hit an anticompetitive wall.

4.     In 2008, software company CCC was poised to secure a monopoly over Estimatics products by acquiring its next-biggest competitor at that time. Although CCC abandoned that merger following a lawsuit filed by the Federal Trade Commission and a preliminary injunction issued by a U.S. District Court, discovery has made clear that CCC did not abandon its monopolistic aspirations. Instead, it pivoted to another anticompetitive strategy to target its competitors and dominate the Estimatics market.

5.     Since its failed merger, CCC has squeezed out its existing rivals and new entrants such that it now has approximately 85% of the Estimatics market, as boasted by its executives. It has achieved this dominance through a multi-faceted anticompetitive scheme, including locking up nearly all of the largest customers into multi-year exclusive contracts. ███████████████ ████████████████████████████████████████

6.     Not only does CCC have exclusivity with respect to downstream customers, it has also prevented rivals from gaining access to inputs needed to compete. In particular, CCC entered into a ███████████ agreement with Hearst for a database of parts and labor data that are

critical for Estimatics products. And, to entrench the lockout, CCC's exclusive agreement with Hearst ████████████████████████████

7.     As a direct result of CCC's anticompetitive conduct, companies that wanted to purchase Tractable's products have been unable to do so. Even in its own documents, CCC acknowledges █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

8.     The advent of CCC's anticompetitive strategy has deprived users of innovative products like Tractable's and made it impossible to constrain CCC's dominance through competition. Today, CCC regularly charges multiple times more than its competitors, yet competitors are unable to compete with CCC on the merits. This translates into increased costs for the users of auto claim software tools due to the lack of choice, as well as reduced innovation in the industry (despite companies, like Tractable, that are ready and willing to provide it), and higher premiums for American consumers.

9.     As one of the excluded competitors trying to reverse that trend and improve the industry, Tractable seeks the damages CCC caused it as a result of its antitrust violations, as well as an injunction from similar acts in the future, so that CCC's long history of anticompetitive behavior finally can be stopped.

## **PARTIES**

10.     Plaintiff Tractable Inc. is a Delaware corporation with its principal place of business in New York.

11.     Defendant CCC Intelligent Solutions, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because CCC is headquartered within this judicial district. This Court has general jurisdiction over CCC for the same reason.

## FACTUAL BACKGROUND

### I.     The Auto Claim and Repair Process

14.     The first step in the auto claim process is known as the first notice of loss ("FNOL"). FNOL occurs when an insured or claimant informs their insurance company that they suffered a loss as specified in their insurance policy.

15.     In response to a FNOL and in accordance with the adjudication process of a claim, an insurer assigns an individual (an appraiser or an adjuster)[1] to determine liability and coverage. As part of the claim review process, a determination is made of whether the damage to the vehicle means the vehicle is a total loss or can be repaired (a process known as "triage"). This assists the adjuster in calculating the amount of any claim settlement. The appraiser or adjuster does so by, *inter alia*, assessing the nature and extent of the vehicle's damage, estimating whether the cost to repair exceeds the replacement cost, estimating the costs of repair parts (if a repair is economical), and estimating labor costs.

---

[1] "Appraiser" and "adjuster" are used interchangeably throughout these counterclaims.

16. Historically, most insurers offered their customers three to four different methods of inspection ("MOIs") to assess damages to a vehicle. These methods often include: a direct repair program between insurance companies and certain repair facilities; insurance company staff inspection at the vehicle's location if within a staff member's territory; an inspection performed by an independent appraiser; or a self-service model where the vehicle owner may submit their own photos of a claim.

17. Today, the various MOIs insurers use will fluctuate based on market preference. Currently there is a push to utilize the MOI that is most conducive to high policyholder satisfaction; with the utilization of technological advancements that make it easier to use software applications and tools to perform an appraisal. It is also due to certain contractual arrangements discussed further below.

18. Once an appraisal is complete (and if it does not, based on the insurance company's determination, indicate the vehicle is a total loss), the insurance company will notify the vehicle owner of claim coverage. The vehicle owner will then determine where they want to have the repairs done to their vehicle. This may include the use of a repair facility that is part of an insurers' direct repair network. Once the repairer receives the authorization to repair, the repair facility will determine if there are additional repairs or parts needed. If the shop makes this determination, it needs to seek insurer and vehicle owner authorization for the added repairs or parts. This process is called a "supplement" and relies on similar tools/processes as those an adjuster employed initially in the claim process.

19. Throughout the appraisal and claim process, both the insurer and insured have the option to perform claim reviews; *i.e.*, to review or audit the claim to ensure that it is proceeding according to their satisfaction. There are two types of claim review: (1) the insurer reviews claim

information provided by the claims adjuster and/or repair facility, and makes decisions based on that information (*i.e.*, an audit); and (2) the insured can appeal the insurer's decisions during the claim adjustment and repair phases, and seek to change those decisions.

20.     Once the appraisal process is complete, the insurer pays the final amount of the claim, a process known as "settlement."

21.     Often, the insurance company that handles the claim and approval of the repairs is the insurance company of the vehicle owner, but they were not at fault. In those cases, the insurance company will seek compensation for the repairs from the at-fault individual's insurance company, a process referred to as "subrogation." The two insurance companies in those situations will evaluate the method used to repair the vehicle.

## II.     The Relevant Market at Issue in This Case

22.     Within the auto claim industry, there are software products that allow industry participants to perform certain tasks throughout the auto claim process.

### A.  Estimatics Products

23.     Performing partial loss estimations was once a manual process. The appraiser/claims adjuster would perform the calculations either by hand or with a desk calculator. The advent of personal computers and, later, mobile electronics ushered in a new era of estimation of vehicle repair costs with the creation of software products known as "Estimatics." Estimatics products can be used to identify automotive damage, diagnose necessary repairs, and estimate the costs of such repairs. Today, all major automobile insurers use Estimatics software products, as do the vast majority of repair facilities. Estimatics products provide much faster than manual calculations, permit analysis of more kinds of information, and are considered more reliable, consistent, and accurate.

24.     Certain Estimatics products require access to a database of parts and times to replace parts, which are then tracked as line items in a vehicle repair estimate that is based on inputs indicating what is damaged on a particular vehicle. The product's software then uses that and other information to calculate the total cost of repair, taking into consideration overlap times (such as the need to remove a bumper only once to perform two repairs behind or to the bumper). As the sophistication of Estimatics products has grown over the years, so too has the information on which they rely. Whereas such products previously used fairly rudimentary algorithms to calculate repair costs, today—depending on the specific product—they rely on much more complex programming and, as particularly relevant to this dispute, have begun employing artificial intelligence to identify automotive damage, diagnose necessary repairs, and estimate the costs of such repairs.

25.     When compared with other types of software products, Estimatics constitute a distinct product market. Estimatics have a unique purpose—specifically related to auto repair claims—and other types of software or other products cannot act as a substitute. The automobile-specific data necessary to perform estimations for damaged vehicles means that software created for other industries are not substitutable by users. Furthermore, there is widespread recognition within the auto repair industry that Estimatics are a specific category of software product that have peculiar uses and characteristics and distinct categories of users (insurers and repair facilities). Estimatics are priced independently of other types of software products, and Estimatics purchasers do not cross-compare the prices of other types of software products to estimate repair costs because they are not reasonably substitutable. Customers thus cannot reasonably substitute non-Estimatics software for Estimatics software. A hypothetical monopolist imposing a small but significant non-

transitory increase in price of Estimatics software would not cause customers to turn to other non-Estimatics software products.

26.     In November 2008, the Federal Trade Commission filed a complaint in the U.S. District Court for the District of Columbia, seeking to enjoin the proposed merger of CCC and a smaller software company, Mitchell International, Inc. The district court issued a preliminary injunction and temporary restraining order prohibiting the consummation of the merger, and the parties subsequently abandoned the deal. In that litigation, CCC conceded that Estimatics constitutes a relevant product market. *See F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 38-39 (D.D.C. 2009).

27.     As recognized by the district court in *F.T.C. v. CCC Holdings, Inc.*, Estimatics software products are "much faster than manual calculations, permit analysis of more kinds of information, and are considered more reliable, consistent, and accurate" than repair estimates conducted by hand. 605 F. Supp. 2d 26, 31 (D.D.C. 2009). Customers thus cannot reasonably substitute manual estimations for Estimatics software. A hypothetical monopolist imposing a small but significant non-transitory increase in price of Estimatics software would not cause customers to turn to manual estimations or other products.

**B.  The Relevant Geographic Market**

28.     The geographic market for Estimatics products is the United States. The data in the Estimatics software, including the parts and labor cost and time estimates, are specific to vehicles driven in, and repairs performed in, the United States. Estimatics products sold outside the United States that rely on foreign data thus cannot be used by customers for estimating repair costs in the United States. CCC conceded that the United States constitutes the proper geographic market in

the previous FTC enforcement action. *See F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 44 (D.D.C. 2009).

### III.    CCC's Monopoly and Market Power

29.    Through the anticompetitive conduct alleged more fully below, CCC has steadily gained share over the years and entrenched itself as the dominant seller of Estimatics products. Currently, CCC possesses over 70–80% share of the relevant market. CCC documents state that the company controls 85% of all insurance claims. Indeed, as shown in an interview transcript produced by CCC, CCC's own former executive admitted that CCC is "broaching monopoly territory." CCC touts it is uniquely positioned in the market and "processed more than $1 trillion of historical data across our network."[2]

30.    There are large barriers to entry in the U.S. Estimatics market, both natural and artificial. These include, but are not limited to, (1) the substantial time, expense, and effort required to assemble, edit, and maintain databases related to virtually every vehicle driven in the U.S. as required by customers, to develop and market a communications software platform; (2) reputation and expertise required by customers to operate these systems; and (3) long-term contracts with customers.

31.    CCC has used its monopoly power to create an artificial barrier to entry by preventing interoperability with competitor products. In particular, CCC originally urged purchasers to adopt its products because they were "open" and could interoperate with other manufacturers' products. CCC, however, changed its stance on that openness once it realized the competitive threat posed by companies like Tractable. More specifically, once it achieved dominance of the Estimatics market, CCC switched its stance and created "closed" products, such

---

[2] CCC Intelligent Solutions Holdings Inc. Form 10-K filed February 28, 2024, at 5.

that competitors' products could not practically interact with CCC's products or create files that could be ingested into CCC's products without substantial effort, and thus customers could no longer freely choose which products they perceived as best or the best value.

32.     As CCC documents explicitly acknowledge, "it's very tough to break into a market where another player is the dominant one." CCC has increased the limitations on importation of information from non-CCC sources, including by blocking imports of files meeting industry standard specifications—standards that CCC was involved in creating.

33.     Not only does CCC impose barriers to importing data from competing software products, CCC makes it difficult for customers to switch away from its products by claiming ownership of data that its customers enter into its platform, including information and photos that are used to generate claims estimates. The prospect of losing access to this data impedes CCC's customers from working with other Estimatics platforms. Additionally, these barriers make it so that customers are unable to use their own data, which *they generated,* in coordination with third parties, such as Tractable. The contractual restrictions on users' ability to transfer their own information and photos also limits the training sets available for competing AI products, while at the same time CCC preserves its rights to train its products with that very same information generated by their customers.

34.     CCC is able to control prices, such that it can raise prices for its Estimatics products unilaterally without fear of competitors taking market share. The two other Estimatics companies in the U.S. are much smaller than CCC and have been steadily losing market share to CCC despite providing certain products of similar quality and scope. For example, the prices CCC charges for its products are in some instances multiple times higher than the prices other competitors charge

for comparable products, yet CCC continues to gain market share for those products without losing customers—quintessential evidence of monopoly power.

35.     To this point, CCC's financial disclosures show its revenue growth is accelerating, despite its long-term competitors' efforts to compete on price and quality.[3] One such competitor excluded from the market is Tractable in the U.S. due to CCC's anticompetitive conduct.

## IV.     Tractable's Competitive Threat to CCC

36.     Tractable, founded in 2014, is a startup focused on improving aspects of the insurance industry via artificial intelligence technologies. As a young technology-focused company, Tractable focuses on changing the way auto insurers handle claims by applying AI to accident and disaster recovery. The company's technology looks at the asset damage and predicts repair operations from photos in real time, so that claims can be settled faster. Instead of taking days or even weeks to assess a claim after a car accident, insurers using Tractable can complete the process in minutes. For example, drivers insured by an auto insurer that uses Tractable's technology can upload photos and completely resolve some claims—right down to receiving an offer of payment—in minutes of their first notice of loss.

37.     Tractable enjoys success overseas, particularly in Europe and Asia. Its clients include several of the largest insurers in those regions. Tractable has also received extensive recognition and numerous awards for its breakthrough products, from (among others) the Insurance Post, the Insurance Times, Insurance Insider, CB Insights, and Digital Insurance Agenda. These awards include being named in Deloitte's UK Technology Fast 50; ranking as number two in Sønr Global's Insurtech 100 of 2022; winning "Most Interesting Innovation for Insurance" at Poland's annual Banking Forum and Insurance Forum in 2022; inclusion as one of

---

[3] Form 10-K filed February 28, 2024, at 39.

the 100 leading AI companies in the world in 2020 and 2021 by CB Insights; winning the Best Technology Award in the 2020 British Insurance Awards; being named Best Computer Vision Solution at the 2020 AI Breakthrough Awards; being named 2020 Claims Product Solution of the Year FNOL by the Insurance Times; 2020 Insurance Innovation of the Year and Disruptor of the Year by Insurance Insider' 2020's Best UK Startup by *Startups* magazine; inclusion as a 2020 member of the AI 100 by CBInsights; inclusion as a 2019 member of the FinTech50 (top 50 fintech companies in Europe); inclusion as one of Insurance Post's Top 100 Insurtech firms of 2019; inclusion as one of Digital Insurance Agenda's top insurtechs of 2018; and Digital Insurance Agenda's 2017 Diamond Award. The company continues to rapidly grow in those other regions, but it has been stymied in its efforts to recreate that success in the U.S. due to CCC's anticompetitive conduct. Although U.S. customers have recently expressed interest in purchasing Tractable's products, CCC's anticompetitive acts have precluded those sales.

38.     As relevant to this lawsuit, Tractable offers AI-based damage assessment tools, where in simplistic terms Tractable's AI performs a computer-based visual assessment where the technology acts as if it were an appraiser. Tractable also offers AI-based claim audit/review tools for situations in which a damage assessment has already been created. These can include the review of estimates for ongoing repairs or review of final invoices for completed repairs (such as in the subrogation context). Tractable has for years attempted to sell these products to numerous U.S. entities, but has been blocked from doing so by CCC who has stated that Tractable's products compete with CCC's.

39.     For its part, CCC offers its own "Smart Claims" products to insurers, including but not limited to its Quick Estimate app, noting that "AI-injected tools can instantly identify total loss from repairable vehicles, detect damage and help automate claims, estimating, review and more."

12

CCC recognizes that "AI solutions" are the wave of the future, and it therefore is currently advertising its development of those solutions as a major selling point of the company.

40.     CCC documents produced in this litigation demonstrate that CCC 

As one CCC document succinctly put it:

41.     Tractable's AI-based Estimatics tools represent a competitive threat to CCC for a variety of reasons, including but not limited to the following.

42.     *First*, CCC does not offer sophisticated AI-based tools and is therefore at a competitive disadvantage to companies, such as Tractable, that offer high-quality versions of such tools. If such AI-based tools became commonplace without CCC controlling their proliferation, that would undercut its market dominance.

43.     *Second*, CCC historically priced Estimatics products on a per-license basis; *i.e.*, it charged customers a certain amount for each license they obtained, which corresponded to individuals performing appraisals, claim audits/reviews, and related estimations. On the cost side,

AI-based tools greatly increase the number of estimations customers can perform, which has the dual effect of decreasing CCC's revenues (because customers need fewer licenses) and increasing its costs

This means that AI-based tools threaten CCC's profits on a systemic level.

44.     *Third*, because AI-based tools, such as those Tractable offers, represent a better, more efficient option for insurers, they threaten CCC's dominance. It is for these and other reasons

that CCC wishes to minimize the proliferation of competitive AI-based tools and has resorted to anticompetitive conduct to do so.

### V.     CCC's Anticompetitive Behavior

45.     CCC's anticompetitive strategy includes two distinct exclusive dealing arrangements—one focused on customers, and the other on data inputs. These individual acts do not proceed in a vacuum; they reinforce each other and magnify the anticompetitive effects of CCC's scheme.

46.     ***Exclusive dealing – downstream customers.*** In 2000, CCC admitted in court filings that "CCC's insurance clients represent the most critical source of CCC revenue." Since then, CCC has not only maintained the vast majority of those relationships, but it has expanded on them and gained ever more insurance company clients at the expense of other rivals. Central to this growth are CCC's exclusive deals with its customers embodied in long-term contracts.

47.     The scope of CCC's exclusive agreements has grown and now foreclose access to at least 70–80% of the relevant market for Estimatics products. In an interview transcript only recently produced by CCC in August 2023 in this litigation, CCC's Former Vice President of Product Development said, "CCC had 23 of the top 25 carriers in North America. . . . Everyone else is pretty much CCC-exclusive at this point." Tractable only became aware of the scope of CCC's exclusivity agreements—in terms of both their reach within the market and term length— recently as a result of discovery in this litigation.

48.     And the exclusivity is not limited to just Estimatics products. CCC has continually grown and expanded its product offerings all sold under the CCC ONE brand, and considers as competitors anyone who offers anything similar to any one of its offerings. CCC ONE is in effect an amalgamation of products, at the core of which sits the CCC Estimatics products. So CCC's

exclusivity clauses are not limited to just blocking competitors for their core Estimatics products, but to numerous other companies who attempt to compete with CCC. As time goes on, the scope of excluded companies, services, and technologies continues to grow.

49. Documents produced in this litigation show that ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

50. While insurance companies are the largest and most competitively important purchasers of Estimatics products, CCC's exclusivity impacts auto repair facilities as well. Repair facilities are often expressly required to use CCC products if they want to participate in lucrative partnerships with insurance carriers, called Direct Repair Programs ("DRPs").

51. As CCC's former executive explains in a document produced by CCC, "You want to be what's in the insurance industry to have what's called DRPs or direct repair programs, which is where a carrier may sign specific contractual agreements with, say, 5,000 repair facilities in North America to say if I send you my [] claim, you will charge me these rates and you'll use these parts and you'll see these providers and all these various procedures. So if you're a repair facility, you watch [the carrier's] business, you need to be in CCC's network and, very likely, you need to run CCC's software in your repair facilities as well."

52. For example, CCC documents also show that ███████████████████ are required to use CCC products. As yet another example, ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████ As CCC's former executive put it, CCC requires its insurance company to issue a "Thou shalt use CCC" mandate to its repair facilities to further entrench CCC's monopolistic hold in the market. While CCC has, to date, refused Tractable's discovery requests for the remainder of its agreements other than its ████████████████ CCC's practice of using of long-term, exclusive agreements with its customers to solidify CCC's monopolistic position in the market is now clear from the ████ ████████████ and statements made by CCC's former executives found in other CCC documents produced in this litigation.

53. Moreover, repair facilities must have access to the software that the insurance companies exclusively use, or else lose a significant portion of their business (or suffer a competitive disadvantage) as well. As explained in a transcript from an interview with CCC's former executive that CCC produced in August 2023, "[I]f you are a repair facility, well, CCC had 23 of the top 25 carriers in North America. . . . Everyone else is pretty much CCC-exclusive at this point. If you're a repair facility, and certainly for a multisite operator, you want to be in that one." In other words, CCC's express and *de facto* exclusive deals make it economically infeasible for repair facilities to purchase non-CCC Estimatics products.

54. Separately and combined, CCC's exclusive arrangements substantially foreclose sales to purchasers of Estimatics products. There are no feasible alternative sales outlets for competing Estimatics companies.

55. CCC maintains and expands its exclusive dealing through coercion. Specifically, although customers would prefer to purchase competing Estimatics products, CCC ████████ ████████████████████████████████████████████████

16

████████████████████████████████████████████████████

███████████████████████████████████

56.     The intended impact of CCC's anticompetitive behavior was not lost on CCC. As part of ███████████████████████ documents produced in August 2023 by CCC show that its executives explicitly discussed ████████████████████████████████

███████████████████████████ A CCC strategy PowerPoint further discussed ██

████████████████████████████████████████████████████

█████

57.     ***Exclusive dealing – upstream data inputs.*** In addition to exclusive deals with downstream customers, CCC has further cemented its market dominance by deliberately locking up inputs needed by Estimatics competitors.

58.     One instance of input exclusivity involves CCC's exclusive agreement with Hearst for the Motor database—the only available industry-accepted source of auto parts and labor data in the U.S. The Motor database covers more than 95% of all automobiles in the U.S. market and includes parts data on all major makes and models of vehicles sold in North America, including historical information for many years. Among other information, the database also has comprehensive information on labor times and costs, which is the result of an enormous number of expert-supervised time studies.

59.     CCC entered into an exclusive license for the Motor database and persists in maintaining that exclusivity to this day. Under the terms of their license agreement, Hearst is

████████████████████████████████████████████████████

████████████████████████████████████████████████████

17

███████████████████ Tractable first became aware of the scope of this arrangement through documents produced in this litigation.

60.     As noted previously, any Estimatics provider *must* have access to a parts and labor database in order to provide a competitive product. This is because reliable estimates and claim audits/reviews depend on up-to-date and accurate part costs, reliable labor estimates, and other information in the Motor database. By precluding access to the only available example of such a database, CCC prevents new entry, stifling innovation and harming competition as a result. The only other competitors with access to similar databases are Audatex and Mitchell, but their databases are proprietary and not made available to competitors; *i.e.*, they are captive databases.

61.     A new entrant without access to an existing database cannot simply create one of its own in order to compete. To create a credible database that auto repair industry participants can trust and use for their claims estimates and analyses, a new entrant would need to regularly perform highly resource-intensive tasks, such as data revisions and time studies, by using parts data from the original equipment manufacturers (*i.e.*, car manufacturers), and continually update and refine its data. As the U.S. District Court found when enjoining CCC's merger with a smaller rival in 2009, "[i]t would take a number of years, untold thousands of man-hours, and millions of dollars of investment to create and maintain a competitive parts and labor database." *F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 51 (D.D.C. 2009). Such a task is not commercially possible for a new entrant that wishes to compete effectively (or at all) in the relevant markets. The Motor exclusive deal thus helps maintain CCC's dominance.

62.     Access to the Motor database is critical for competition in the relevant markets. Indeed, in the FTC's 2009 merger challenge, CCC offered to "relinquish its exclusive rights to license Hearst's Motor database, allowing any competitor or entrant the opportunity to obtain

immediate access to a comprehensive, fully updated database of parts and services." *F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 51 (D.D.C. 2009). CCC argued that "this renewed open access to the Motor database" would help spur competition and allow access to new entrants, because they would have access to a critical input for competing products in the relevant markets. However, because the FTC succeeded in enjoining CCC's merger at that time, CCC never relinquished its exclusive control over the Motor database. Instead, ██████████████████████████████ ██████████████████████████ to solidify its market dominance in combination with the other anticompetitive conduct described herein.

## VI.   The Anticompetitive Effects of CCC's Conduct and Tractable's Resulting Injury

63.     CCC's anticompetitive conduct harms competition by excluding rivals, substantially foreclosing access to the market, and restraining customers from doing business with CCC's competitors, including Tractable. These acts have increased over time as CCC has gained ever more market share in the U.S. and, today, they artificially (and intentionally) cement CCC's dominance and power.

64.     The cumulative effect of CCC's anticompetitive scheme has been to entrench its dominance in the relevant market for Estimatics products such that competitors are unable to take market share away from it by virtue of lower prices, higher-quality or more innovative products, increased choice between product features or types, higher output for their products, or any other procompetitive tactic.

65.     Compounding the anticompetitive effects, insurers often need to benchmark their repair key performance indicators ("KPIs") with their competitors' KPIs, so they can assess how best to underwrite and assess risk. As the dominant Estimatics product provider in the U.S., CCC has the most comprehensive set of benchmarking data available for insurers. It has used that

position to bolster its dominance by insisting on and obtaining exclusive deals. This means that insurers must commit to and remain with CCC's products to have access to this benchmarking data, or otherwise be at a competitive disadvantage to their main competitors. CCC's use of its benchmarking data in this way thus erects another barrier to new entry.

66.     Tractable has personally suffered in terms of lost contracts, lost opportunities with customers, lost profits, and substantial diminution in its enterprise value as a result of CCC's anticompetitive conduct.

67.     In particular, despite offering products that are of higher quality than CCC and desired by customers—as demonstrated by its substantial success overseas, in markets that CCC does not dominate—Tractable is unable to draw away CCC customers in the U.S. due to the interrelated exclusionary practices detailed herein.

68.     Customers have been directly prevented from purchasing Tractable's superior Estimatics products because of CCC's anticompetitive conduct. For example, a CCC document

69.     CCC leadership have specifically attributed its market dominance to CCC's exclusive agreements. As CCC documents show, a former CCC executive admitted "insurance carriers, they would love to have another option." Yet as long as CCC's anticompetitive conduct continues unabated, they cannot.

## FIRST CLAIM FOR RELIEF

### (Sherman Act, Section 1, 15 U.S.C. § 1)

70.     Tractable repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

71.     As alleged above, CCC and customers have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power for CCC in the relevant market for Estimatics products in the United States.

### Exclusive dealing arrangements with customers

72.     CCC has entered into long-term exclusive dealing arrangements with customers with respect to the provision of Estimatics products.

73.     CCC's arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

74.     CCC's arrangements cannot be circumvented.

75.     CCC's arrangements with customers are of long duration and not easily terminable as a matter of practical economics.

76.     CCC has coerced customers to enter into these arrangements.

77.     CCC's arrangements are not the product of competition.

78.     CCC's arrangements have had the effect of substantially lessening competition in the relevant market.

<u>Exclusive dealing arrangements with Hearst</u>

79.    CCC has entered into ███████████████████████ with Hearst with respect to access to the Motor parts and labor database, which is a necessary input for products within the relevant market.

80.    CCC's arrangement has had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

81.    CCC's arrangements cannot be circumvented.

82.    CCC's arrangement with Hearst is ████████████████████████ ██████████████████

83.    CCC has coerced Hearst to remain in this arrangement.

84.    CCC's arrangement is not the product of competition.

85.    CCC's arrangement has had the effect of substantially lessening competition in the relevant market.

86.    CCC's conduct has no legitimate business purpose or procompetitive effect.

87.    There are less restrictive alternatives to the restraints CCC imposed on the relevant market.

88.    CCC's conduct has had a substantial effect on interstate commerce.

89.    Tractable has been or will be injured in their property as a result of CCC's conduct.

90.    Tractable has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Tractable has been and will be injured by the harm to competition as a result of CCC's conduct.

## SECOND CLAIM FOR RELIEF

**(Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)**

91.     Tractable repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

92.     CCC possesses monopoly power in the relevant markets for Estimatics products in the United States. CCC has the power to control prices or exclude competition in the relevant market.

93.     CCC has market share of at least 70–80% of the relevant market.

94.     CCC has willfully acquired and maintained monopoly power by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to long-term exclusive dealing arrangements, as alleged herein.

<u>Exclusive dealing arrangements with customers</u>

95.     CCC has entered into long-term exclusive dealing arrangements with customers with respect to the provision of Estimatics products.

96.     CCC's arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

97.     CCC's arrangements cannot be circumvented.

98.     CCC's arrangements with customers are of long duration and not easily terminable as a matter of practical economics.

99.     CCC has coerced customers to enter into these arrangements.

100.     CCC's arrangements are not the product of competition.

101.     CCC's arrangements have had the effect of substantially lessening competition and tending to create a monopoly in the relevant market.

Exclusive dealing arrangements with Hearst

102.     CCC has entered into ████████████████████████████ with respect to access to the Motor parts and labor database, which is a necessary input for products within the relevant market.

103.     CCC's arrangement has had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

104.     CCC's arrangements cannot be circumvented.

105.     CCC's arrangement with Hearst ████████████████████████████ ██████████████████

106.     CCC has coerced Hearst to remain in this arrangement.

107.     CCC's arrangement is not the product of competition.

108.     CCC's arrangement has had the effect of substantially lessening competition and tending to create a monopoly in the relevant market.

109.     CCC's conduct has no legitimate business purpose or procompetitive effect.

110.     There are less restrictive alternatives to the restraints CCC imposed on the relevant market.

111.     CCC's conduct has had a substantial effect on interstate commerce.

112.     Tractable has been or will be injured in their property as a result of CCC's conduct.

113.     Tractable has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Tractable has been and will be injured by the harm to competition as a result of CCC's conduct.

## JURY DEMAND

114.     Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Tractable demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Tractable requests the following relief:

a.      Damages in an amount to be determined;

b.      Treble damages;

c.      Attorneys' fees;

d.      Costs;

e.      Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

f.      Injunctive relief, including but not limited to an injunction barring Defendants' conduct alleged in the Complaint;

g.      Declaratory relief, including but not limited to a declaration and judgment that CCC's conduct alleged in the Complaint violates the laws alleged in the Complaint; and

h.      Such other and further relief as the Court deems proper and just.

DATED: March 11, 2024                  Respectfully submitted,

KING & SPALDING LLP

*/s/ Lazar P. Raynal*
Lazar P. Raynal (Bar No. 6199215)
Michael A. Lombardo (Bar No. 6334886)
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
lraynal@kslaw.com
mlombardo@kslaw.com

Julia C. Barrett (*pro hac vice*)
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, Texas 78701
Telephone: (512) 457-2000
jbarrett@kslaw.com

Robert M. Cooper (*application pending*)
Christopher C. Yook (*application pending*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, DC 20006
rcooper@kslaw.com
cyook@kslaw.com

*Attorneys for Defendant and Counterclaimant
Tractable Inc.*