# EXHIBIT B
# Highly Confidential - Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CCC INTELLIGENT SOLUTIONS INC.,   )
                                             )
      Plaintiff and Counter-Defendant,   )
                                             )    Civil Case No. 1:18-cv-07246
v.                                          )
                                           )    **Jury Trial Demanded**
TRACTABLE, INC.,                 )
                                           )
      Defendant and Counterclaimant.   )

**TRACTABLE INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S FIRST AMENDED COMPLAINT**

Tractable did not misappropriate any of CCC's trade secret information. Tractable sought to determine whether it could use CCC ONE to help generate and transmit auto claims appraisals into the claims workflow of US auto insurers, similar to a third party auto appraiser. In the United States, these claims workflows are dominated by CCC. Tractable's conduct in attempting to develop a product that could be used by customers alongside CCC's intentionally closed system is not a violation of any law. CCC's anti-competitive and exclusionary conduct, however, does a disservice to the insurance industry and its customers.

Unless expressly admitted below, Tractable denies each and every allegation set forth in the Amended Complaint, including, without limitation, any allegations set forth in the headings, subheadings, and Prayer for Relief. As set out in its specific denials below, for example, Tractable denies that it misappropriated any alleged confidential or trade secret information or caused CCC any damages. Moreover, there is nothing Tractable had access to through CCC ONE that is a trade secret. Frustrated with the manner in which Tractable obtained a license to use CCC ONE, CCC has retaliated based on nothing more than "information and belief" that Tractable "performed structured

1

tests of CCC ONE in an attempt to replicate its algorithms and mimic its software logic and/or database." CCC lacks any factual basis for those allegations. At most, CCC alleges that Tractable used CCC ONE to create partial estimates that were not transmitted to an insurance company through the CCC ONE platform (as the platform would not allow partial estimates to be transmitted). But CCC does not allege any conduct causing any harm to CCC or facts to support CCC's conclusion that Tractable misappropriated any alleged trade secret information.

Pursuant to Rule 8, allegations in the Amended Complaint to which no responsive pleading is required, including legal arguments and legal conclusions, shall be deemed as denied. Tractable expressly reserves the right to seek to amend and/or supplement its Answer and Affirmative Defenses as may be necessary, including the right to assert and rely upon any additional defenses as may be discovered. Incorporating the foregoing, Tractable answers the Amended Complaint's separately numbered paragraphs as follows:

1.    Tractable admits that it obtained a software license to access CCC ONE under the name JA Appraisal that CCC regularly makes available to thousands of independent appraisers across the nation (apparently with no investigation into their identity). Tractable further admits that CCC has filed the current action purporting to seek "redress" from Tractable. Tractable denies the remaining allegations in Paragraph 1, including that CCC's claims have any merit or that CCC is entitled to any relief. Specifically, Tractable denies that it obtained a license to "analyze and probe" CCC ONE, that it engaged in any fraud in connection with the license, or that it misappropriated any of CCC's proprietary or confidential information.

2.    Tractable admits the allegations in the first sentence of Paragraph 2, and that the CCC ONE platform allows users to generate and communicate vehicle damage estimates. Tractable further admits, on information and belief, that the CCC ONE platform contains a database of information CCC obtained through a license to use the Hearst Motor Database—which contains certain

information regarding part prices for replaced parts, labor times for removal and replacement of damaged parts, and refinish times (the time to paint an entire replaced or repaired part)—that is made available to licensees of the CCC ONE platform. On information and belief, for at least the period that Tractable had access to CCC ONE, the contents of the Hearst Motor Database were available for purchase in book and electronic form by the public without any obligation of confidentiality. Tractable lacks sufficient knowledge or information about CCC's business or its alleged confidential database to admit or deny the remaining allegations in Paragraph 2 and therefore denies them.

3. Tractable admits that an insurance company may utilize an independent appraiser to assist it with vehicle damage estimates, and that CCC offers licenses to thousands of independent appraisers. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 3 and therefore denies them.

4. The allegations in Paragraph 4 purport to describe CCC's independent appraiser licenses, which are documents that speak for themselves. Tractable refers to the independent appraiser license for its true and complete contents. To the extent any allegations in Paragraph 4 are inconsistent with the terms of CCC's independent appraiser license, those allegations are denied.

5. Tractable admits that on August 23, 2017, Xing Xin—under the name "Jason Chen"—sought and obtained an independent appraiser license from CCC to use CCC ONE. Mr. Xin informed CCC that "Jason Chen" was not his real name and obtained the license for "JA Appraisal," which at the time was not a registered d/b/a for Tractable but was a name under which Tractable intended to potentially do appraisal-related work. Tractable admits it is a technology company that, among other things, uses artificial intelligence to produce repair estimates based on images of vehicle damage. Tractable denies any remaining allegations in Paragraph 5.

6. Tractable admits that it identified itself using the unregistered d/b/a "JA Appraisal" when obtaining the license; Tractable denies that it made any representation as to the "existence" of

JA Appraisal as an incorporated or registered "entity" under any state law. To the contrary, Xing Xin explained he was not using his legal name when obtaining the license and CCC did not further inquire as to the identity or affiliation of Jason Chen or JA Appraisal. Tractable denies the remaining allegations in Paragraph 6, including that it employed a litany of deceptive or clandestine tactics to gain or keep access to CCC ONE.

7.      Tractable denies the allegation in Paragraph 7, as stated.

8.      Tractable admits it had access to CCC ONE for approximately 14 months through a license agreement with CCC. Tractable denies that it committed fraud in connection with its license to use CCC ONE.  Tractable admits that it used its access to CCC ONE to prepopulate estimates with certain human judgment decisions, but denies the remaining allegations in Paragraph 8. Tractable denies that it used any proprietary information to develop any of Tractable's award-winning unique AI-based technology.

9.      Tractable admits that CCC purports to seek damages and other relief through this action, but Tractable denies that CCC's claims have any merit, that Tractable damaged CCC, or that CCC is entitled to recover any form of relief. Tractable denies any remaining allegations in Paragraph 9, including the allegation that Tractable committed fraud.

## JURISDICTION AND VENUE

10.      Tractable denies that CCC's claims have any merit but does not dispute that this Court has subject matter jurisdiction.

11.      Tractable denies that CCC's claims have any merit but does not dispute that this Court has personal jurisdiction over it for purposes of this action only.  Tractable denies the remaining allegations in Paragraph 11.

12.      Tractable denies that CCC's claims have any merit or that Tractable has caused CCC any damages but does not dispute that venue is proper in this district for purposes of this action

only. Tractable denies any remaining allegations in Paragraph 12.

## PARTIES

13.     Tractable admits Paragraph 13 on information and belief.

14.     Tractable Inc. admits that it is a Delaware corporation with a registered office in California.  Tractable Inc. otherwise denies the allegations in Paragraph 14; Tractable Inc.'s principal place of business is New York, NY.

## GENERAL ALLEGATIONS

15.     Tractable admits that CCC offers technologies and apps for the automotive, insurance and collision repair industries through the CCC ONE Platform.  Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 15 and therefore denies them.

16.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 16 and therefore denies them.

17.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 17 and therefore denies them.

18.     Tractable admits that CCC has a license from Hearst Publications to use the Hearst Motor Database—which contains certain information regarding part prices for replaced parts, labor times for removal and replacement of parts, and refinish times (the time to paint an entire replaced or repaired part).  On information and belief, Tractable denies the allegation that this data is "highly confidential" because the contents of the Hearst Motor Database, at least during the time period that Tractable had access to CCC ONE, were available for purchase in book and electronic form by the public without any obligation of confidentiality and it is made available through CCC ONE by license to thousands of independent appraisers. Tractable denies the allegation that CCC ONE's data and algorithms are "relevant here" because Tractable did not in any way interfere with, misuse, or misappropriate any data or algorithm associated with CCC ONE.  Tractable lacks

5

sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 18 and therefore denies them.

19.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 19 and therefore denies them.

20.     The allegations in Paragraph 20 purport to describe CCC's independent appraiser licenses, which are documents that speak for themselves. Tractable refers to the independent appraiser licenses for their true and complete contents. To the extent any allegations in Paragraph 20 are inconsistent with the terms of CCC's independent appraiser licenses, those allegations are denied.

21.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 21 and therefore denies them.

22.     Paragraph 22 contains only legal arguments and conclusions of law to which no response is required. To the extent a response is required, Tractable denies the allegations in Paragraph 22.

23.     On information and belief, Tractable admits that estimates communicated through the CCC ONE platform identify CCC and CCC ONE as the sources of at least some of the data contained in the estimates.

24.     Tractable denies the allegation in the first sentence of Paragraph 24 that CCC relies on a potential customer's identity and intended uses in deciding whether to provide CCC ONE to a potential customer. When informed that Jason Chen was not Xing Xin's legal name, CCC did not take any action to inquire as to his identity. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 24 and therefore denies them. Tractable further denies that it intended to use CCC ONE to capture any proprietary data, algorithms, or other information.

25.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in

Paragraph 25 and therefore denies them. Tractable denies any allegation that it caused CCC or its network any harm.

26.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 26 and therefore denies them.

27.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 27 and therefore denies them.

28.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 28 and therefore denies them.

29.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 29 and therefore denies them.

30.     Tractable admits that Xing Xin contacted CCC using the name Jason Chen on August 23, 2017, but denies that he "held himself out as" Jason Chen; Xing Xin informed CCC that Jason Chen was not his legal name. Tractable admits that Xing Xin interacted with CCC as a representative of JA Appraisal.  At the time, JA Appraisal was a name under which Tractable intended to potentially do appraisal-related work, and Xing Xin was involved in developing Tractable's business for that work.

31.     Tractable admits that Xing Xin did not expressly state at the time that he was affiliated with Tractable but denies the remaining allegations in Paragraph 31.

32.     Tractable admits that Tractable, doing business as JA Appraisal, obtained an independent appraiser license to use CCC ONE on or about August 23, 2017. The remaining allegations in Paragraph 32 purport to describe CCC's independent appraiser license, which is a document that speaks for itself. Tractable refers to the independent appraiser license for its true and complete contents. To the extent any allegations in Paragraph 32 are inconsistent with the terms of CCC's independent appraiser license, those allegations are denied.

33.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 33 and therefore denies them.

34.     Tractable states that it believed that it was authorized to use the CCC ONE platform and CCC ONE marks via JA Appraisal's license. Tractable accordingly denies the allegations in Paragraph 34.

35.     The allegations in Paragraph 35 purport to describe CCC's independent appraiser license, which is a document that speaks for itself. Tractable refers to the independent appraiser license for its true and complete contents. To the extent any allegations in Paragraph 35 are inconsistent with the terms of CCC's independent appraiser license, those allegations are denied.

36.     Tractable admits that additional users were added to Tractable's license on or about November 29, 2017, February 1, 2018, and March 13, 2018. The remaining allegations in Paragraph 36 purport to describe CCC's independent appraiser licenses, which are documents that speaks for themselves. Tractable refers to the independent appraiser licenses for their true and complete contents. To the extent any allegations in Paragraph 36 are inconsistent with the terms of CCC's independent appraiser licenses, those allegations are denied.

37.      Tractable admits that "JA Appraisal" was not registered as a doing-business-as name for Tractable. The remaining allegations in Paragraph 37, including that JA Appraisal was not "legitimate" and "never existed" are nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is required, Tractable denies the remaining allegations in Paragraph 37.

38.     Tractable admits that it has not registered "JA Appraisal" to do business in California or Delaware and did not mention "JA Appraisal" on its website.

39.     Tractable admits that Xing Xin did not expressly inform CCC that Tractable was doing business as JA Appraisal. Xing Xin did inform CCC that he was not using his legal name

and CCC never inquired as to "Jason Chen's" identify or affiliation. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 39.

40. Tractable denies the allegations in Paragraph 40, as stated.

41. Tractable admits that Jason Chen's legal name is Xing Xin. Tractable denies the allegations in the second sentence of Paragraph 41.

42. Tractable admits it is a technology company that, among other things, uses artificial intelligence to produce real-time cost estimates of accident repair based on pictures of vehicle damage, as described on its website. Tractable Inc. is registered in California, but does not have any offices in London. Tractable Inc.'s subsidiary, Tractable Ltd., has offices in London. Tractable lacks sufficient knowledge or information to admit or deny the remainder of the allegations in Paragraph 42, as stated.

43. Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 43 and therefore denies them.

44. Tractable believed it had a license to use CCC ONE under the "JA Appraisal" name and accordingly denies that it never obtained a license from CCC to use CCC ONE. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 44 and therefore denies them.

45. Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 45 and therefore denies them.

46. Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 46 and therefore denies them.

47. Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 47, as stated. Tractable admits that it input into CCC ONE certain human judgment decisions to prepopulate incomplete estimates that would be provided to an insurer as part of a proof

of concept. The insurer, like most insurance companies in the United States, used CCC ONE. Tractable also admits that the license agreement with CCC mandated that CCC's marks appear on estimates generated in CCC ONE and prohibited users from removing CCC's marks. The remaining allegations in Paragraph 47, including that "the use of marks" were "identical to CCC's protected trademarks," are nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is required, Tractable denies the remaining allegations in Paragraph 47.

48.     Tractable believed CCC authorized it to use CCC ONE through JA Appraisal and therefore denies the allegations in Paragraph 48.

49.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 49 and therefore denies them.

50.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 50 and therefore denies them.

51.     Tractable admits that it did not have a license to use CCC ONE in its own name, but states that Tractable believed it had a license to use CCC ONE as "JA Appraisal." Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 51 and therefore denies them.

52.     Tractable denies the allegation that it committed fraud. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 52 regarding CCC's "database queries" and therefore denies them.

53.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 53 regarding what CCC alleges it "discovered" and therefore denies them. Tractable further states that it no longer has access to CCC ONE to admit or deny the allegations regarding what may exist in CCC's database.

54.     Tractable lacks sufficient knowledge or information to admit or deny the allegations

in Paragraph 54 regarding what CCC "further investigated" and therefore denies them.

55.     Tractable lacks sufficient knowledge or information to admit or deny what CCC may have concluded and therefore denies the allegations in Paragraph 55.

56.     Tractable lacks sufficient knowledge or information to admit or deny what CCC might have done and therefore denies the allegations in Paragraph 56.

57.     Tractable admits, on information and belief, that an estimate cannot be transmitted through CCC ONE to an insurer until the estimate is finalized and locked, and that an estimate that is not finalized and locked cannot be transmitted through CCC ONE to an insurer.  Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 57 regarding a "typical workflow" and therefore denies them.

58.     Tractable denies the allegation that it engaged in any "scheme." Tractable also denies the allegation that it did not use CCC ONE to generate estimates. Tractable used CCC ONE to generate partial estimates and did not remove references to CCC as the source of the estimate, which reference was placed there by the CCC ONE software and required by the independent appraiser license. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 58 and therefore denies them.

59.     Tractable no longer has access to the CCC ONE platform; Tractable accordingly lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 59 and therefore denies them.

60.     Tractable no longer has access to the CCC ONE platform; Tractable accordingly lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 60 and therefore denies them.

61.     Tractable no longer has access to the CCC ONE platform; Tractable accordingly lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 61 and

therefore denies them. Tractable admits, on information and belief, that the workfiles were not finalized, locked and transmitted through CCC ONE.

62. Tractable no longer has access to the CCC ONE platform; Tractable accordingly lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 62 and therefore denies them.

63. Tractable admits the allegations in the first sentence of Paragraph 63. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 63 and therefore denies them.

64. Tractable no longer has access to the CCC ONE platform; Tractable accordingly lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 64 and therefore denies them.

65. Tractable no longer has access to the CCC ONE platform. On information and belief, Tractable admits the allegations in Paragraph 65.

66. Tractable denies the allegations in Paragraph 66.

67. Tractable denies that any chat message or phone call "confirm[s]" that Tractable attempted to replicate CCC's algorithms or "mimic its software logic and/or database." The remaining allegations in Paragraph 67 purport to describe chat messages, which are documents that speak for themselves. Tractable refers to the chat messages for their true and complete contents. To the extent any allegations in Paragraph 67 are inconsistent with the chat messages, those allegations are denied.

68. The allegations in Paragraph 68 purport to describe chat messages, which are documents that speak for themselves. Tractable refers to the chat messages for their true and complete contents. To the extent any allegations in Paragraph 68 are inconsistent with the chat messages, those allegations are denied.

69.    The allegations in Paragraph 69 purport to describe chat messages, which are documents that speak for themselves. Tractable refers to the chat messages for their true and complete contents. To the extent any allegations in Paragraph 69 are inconsistent with the chat messages, those allegations are denied. Tractable denies that the employee inquired "about the inner workings of CCC ONE."

70.    Tractable admits that employees used jaappraisalco@gmail.com and maxgenie@live.co.uk email addresses, but denies the remainder of the allegations in Paragraph 70, as stated.

71.    Tractable admits that it used virtual machines to access CCC ONE, but denies that it did so to conceal its identity from CCC. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 71 and therefore denies them.

72.    Tractable denies the allegations in the first three sentences of Paragraph 72. Tractable admits that in October 2018, Tractable had a job posting for a Vehicle Damage Assessor/Estimator, requiring various skills and experiences including "Working experience of estimating platforms: Mitchell, CCC ONE, and/or Audatex," but denies that this implies that Tractable was attempting to decompose the CCC ONE Platform.

73.    Tractable denies the allegations in Paragraph 73.

74.    Tractable denies the allegations in Paragraph 74.

75.    Tractable lacks sufficient knowledge or information to admit or deny the other allegations in Paragraph 75 and therefore denies them.

76.    Tractable admits that CCC disabled the "JA Appraisal" accounts on or about October 26, 2018. Tractable denies the allegation that it misappropriated CCC's data, algorithms, or other information. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 76 regarding the reason CCC terminated the license and therefore denies them.

77.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 77 and therefore denies them. To the extent CCC has represented that Exhibit 1 to the Amended Complaint is a true and accurate transcription of a call that occurred on October 29, 2018, Tractable refers to the transcription for its true and complete contents. To the extent any allegations in Paragraph 77 are inconsistent with the transcription, those allegations are denied.

78.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 78 and therefore denies them.

79.     Tractable lacks sufficient knowledge or information to admit or deny the other allegations in Paragraph 77 and therefore denies them.

80.     Tractable admits the allegations in Paragraph 80 on information and belief.

81.     Tractable denies the allegations in Paragraph 81.

82.     Tractable lacks sufficient knowledge or information to admit or deny what "CCC did not know" and therefore denies the allegations in Paragraph 82.

83.      Tractable admits it gained access to CCC ONE under the name "JA Appraisal" and the customer type "independent appraiser."  Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 83 and therefore denies them.

84.     Tractable denies the allegations in Paragraph 84.

## COUNT ONE

### Computer Fraud And Abuse Act, 18 U.S.C. § 1030, et seq.

85.     Tractable restates and incorporates by reference its responses to the allegations in Paragraphs 1 through 84 as if set forth fully herein.

86.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 86 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 86.

87.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 87 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 87.

88.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 88 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 88.

89.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 89 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 89.

90.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 90 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 90.

91.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 91 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 91.

92.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 92 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 92.

93.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 93 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 93.

94.     Count I was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 94 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 94.

## COUNT TWO

### Violation Of The Defend Trade Secrets Act Of 2016, 18 U.S.C. § 1836, <u>et seq</u>.

95.     Tractable restates and incorporates by reference its responses to the allegations in Paragraphs 1 through 84 as if set forth fully herein.

96.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 96 and therefore denies them.

97.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 97 and therefore denies them.

98.     Paragraph 98 contains only conclusions of law to which no response is required.  To the extent a response is required, Tractable denies the allegations in Paragraph 98.

99.      Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 99 and therefore denies them.

100.     Tractable denies the allegations in Paragraph 100.

101.     Tractable denies the allegations in Paragraph 101.

102.     Tractable denies the allegations in Paragraph 102.

103.     Tractable denies the allegations in Paragraph 103.

104.     Tractable denies the allegations in Paragraph 104.

105.     Tractable denies the allegations in Paragraph 105. Tractable has not misappropriated any trade secrets.

106.     Tractable denies the allegations in Paragraph 106.

## COUNT THREE

### Violation Of The Illinois Trade Secrets Act Of 2016, 765 ILCS 1065/2

107.     Tractable restates and incorporates by reference its responses to the allegations in Paragraphs 1 through 84 as if set forth fully herein.

108.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 108 and therefore denies them.

109.     Paragraph 109 contains only conclusions of law to which no response is required. To the extent a response is required, Tractable denies the allegations in Paragraph 109.

110.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 110 and therefore denies them.

111.     Tractable denies the allegations in Paragraph 100.

112.     Tractable denies the allegations in Paragraph 112.

113.     Tractable denies the allegations in Paragraph 113.

114.     Tractable denies the allegations in Paragraph 114.

115.     Tractable denies the allegations in Paragraph 115. Tractable never obtained any trade secrets from CCC.

116.     Tractable denies the allegations in Paragraph 116. Tractable has not misappropriated any trade secrets.

117.     Tractable denies the allegations in Paragraph 117.

## <u>COUNT FOUR</u>

**Trademark Infringement In Violation Of The Lanham Act**
**15 U.S.C. § 1114**

118.     Tractable restates and incorporates by reference its responses to the allegations in Paragraphs 1 through 84 as if set forth fully herein.

119.      Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 119 and therefore denies them.

120.     Tractable admits that it "does not have" any current authorization, license, or permission from CCC with request to CCC Marks.

121.     The allegations in Paragraph 121 are nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is required, Tractable denies the allegations in Paragraph 121.

122.     Tractable admits that it created partial incomplete estimates using CCC ONE that, as generated by CCC ONE and required by the CCC license, identified CCC and CCC ONE. The remaining allegations in Paragraph 122 contain nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is required, Tractable denies the remaining allegations in Paragraph 122.

123.     Tractable admits that it created partial incomplete vehicle repair estimates using CCC ONE that, as required by the CCC license and as generated by the CCC ONE system, identified CCC and CCC ONE. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 123 and therefore denies them.

124.     Tractable admits that it created partial incomplete estimates using CCC ONE that, as generated by CCC ONE and required by the CCC license, identified CCC and CCC ONE. Tractable lacks sufficient knowledge or information to admit or deny the allegation in Paragraph 124 and therefore denies them.

125.     Tractable lacks sufficient knowledge or information to admit or deny the allegation in Paragraph 125 and therefore denies them.

126.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 126 and therefore denies them.

127.     Tractable denies the allegations in Paragraph 127.

128.     Tractable denies the allegations in Paragraph 128.

129.     Paragraph 129 contains only legal arguments and conclusions of law to which no

response is required. To the extent a response is required, Tractable denies the allegations in Paragraph 129.

130. Paragraph 130 contains only legal arguments and conclusions of law to which no response is required. To the extent a response is required, Tractable denies the allegations in Paragraph 130.

## COUNT FIVE

### False Designation Of Origin In Violation Of The Lanham Act
### 15 U.S.C. § 1125

131. Tractable restates and incorporates by reference its responses to the allegations in Paragraphs 1 through 84 as if set forth fully herein.

132. Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 132 and therefore denies them.

133. Tractable denies the allegation that it intended to confuse, mislead, or deceive insurers, vehicle repair shops or others, or that Tractable made any misrepresentation regarding CCC's marks or its affiliation with CCC. The remaining allegations in Paragraph 133 are nonfactual legal arguments and conclusions of law to which no response is required. To the extent a response is required, Tractable denies the remaining allegations in Paragraph 133.

134. Tractable denies the allegations in Paragraph 134.

135. Tractable admits that it created partial incomplete estimates using CCC ONE that, as generated by CCC ONE and required by the CCC license, identified CCC and CCC ONE. The remaining allegations in Paragraph 135 contain nonfactual legal arguments or conclusions of law to which no response is required. To the extent a response is required, Tractable denies the remaining allegations in Paragraph 135.

136. Tractable admits that it created partial incomplete estimates using CCC ONE that, as

required by the CCC license, identified CCC and CCC ONE. Tractable lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 136 and therefore denies them.

137.     Tractable admits that it created partial incomplete estimates using CCC ONE that, as generated by CCC ONE and required by the CCC license, identified CCC and CCC ONE. Tractable lacks sufficient knowledge or information to admit or deny the allegation in Paragraph 137 and therefore denies them.

138.     Tractable lacks sufficient knowledge or information to admit or deny the allegation in Paragraph 138 and therefore denies them.

139.     Tractable lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 139 and therefore denies them.

140.     Tractable denies the allegations in Paragraph 140.

141.     Paragraph 141 contains only legal arguments and conclusions of law to which no response is required.  To the extent a response is required, Tractable denies the allegations in Paragraph 141.

142.     Paragraph 142 contains only legal arguments and conclusions of law to which no response is required.  To the extent a response is required, Tractable denies the allegations in Paragraph 142.

## COUNT SIX

### Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510

143.     Count VI was dismissed by the Court's Order on Tractable's Motion to Dismiss dated January 25, 2023, therefore not response to Paragraph 143 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 143.

144.     Count VI was dismissed by the Court's Order on Tractable's Motion to Dismiss

dated January 25, 2023, therefore not response to Paragraph 144 is required. To the extent a response is required, Tractable denies the allegations in Paragraph 144.

## COUNT SEVEN

### Common Law Fraud

145.    Tractable restates and incorporates by reference its responses to the allegations in Paragraphs 1 through 84 as if fully stated herein.

146.    Tractable denies the allegations in Paragraph 146.

147.    Tractable denies the allegations in Paragraph 147.

148.    Tractable denies the allegations in Paragraph 148.

149.    Tractable denies the allegations in the first sentence of Paragraph 149. Tractable lacks sufficient knowledge or information as to what CCC did or does rely upon and therefore denies the allegations in the second sentence of Paragraph 149.

150.    Tractable denies the allegations in Paragraph 150.

### Answer to Prayer for Relief

Tractable denies that CCC is entitled to any relief, and requests that the Court dismiss all claims against Tractable with prejudice and order such further relief as the Court deems just and proper.

### Answer to Jury Demand

Tractable admits that CCC purports to demand a jury trial, while reserving all rights in connection therewith.

## AFFIRMATIVE DEFENSES

Without admitting any of the allegations of the Complaint and without assuming the burden of proof where it otherwise rests with Plaintiff, Tractable pleads the following defenses:

**First Defense**

CCC's claims are barred, in whole or in part, by the doctrine of unclean hands. CCC has employed numerous anticompetitive and exclusionary tactics to maintain a dominant position in the American auto insurance market. CCC's actions include, among other things, exclusive dealing contracts with customers, forcing customers to boycott CCC's competitors, and closing its software platform to prevent new market entrants, like Tractable, from developing products or services that could be used by CCC's customers. CCC also improperly attempts to prevent its insurance company customers from sharing any information with Tractable, including information that is not proprietary to CCC, and is misusing its trademarks for anticompetitive purposes. The intent of CCC's conduct is to prevent Tractable from entering the American auto insurance market with its unique AI-based technology. It is CCC's anticompetitive conduct, unfair business practices, and exclusionary conduct practices that has caused any harm CCC claims to have suffered in this case. CCC has sought and continues to seek to prevent Tractable from working with customers who use CCC's products and is seeking to achieve that aim through claims that Tractable has misappropriated CCC's information and misused CCC's trademarks. But the conduct CCC challenges is because of CCC's own misconduct in the market and, in any event, does not arise to misappropriation of any alleged trade secret or misuse of CCC's trademarks, or fraud.

**Second Defense**

CCC's claims are barred, in whole or in part, because Tractable had an implied license. Tractable obtained the CCC ONE licenses using a d/b/a that, at the time, Tractable intended to use for appraisal-related business. Tractable did, in fact, have access to CCC ONE pursuant to the JA Appraisal licenses—*i.e.*, its access was no different than any other independent appraiser licensee.

**Third Defense**

CCC's claims are barred, in whole or in part, because CCC's alleged trade secrets do not

constitute a trade secret as defined by 18 U.S.C. § 1839(3) and/or 765 ILCS 1065/2(d). Tractable had access to CCC ONE through a license that CCC regularly grants to tens of thousands of appraisers. And the estimates generated by CCC are available to the many insurance companies and repair facilities that use CCC ONE. Additionally, the data that is provided by the CCC ONE system is included on estimates, which are provided to automobile owners and other third parties without any obligations of confidentiality. Further, the data that Tractable would have had access to through CCC ONE was generally available to the public with no obligation of confidentiality, such as through the publication of the Hearst Motor Crash Estimating Guides. The information to which Tractable had access to through the CCC ONE license is not a trade secret.

### Fourth Defense

CCC's alleged trade secrets do not qualify for trade secret protection because they are readily ascertainable by proper means and thus are not protectable as trade secrets.

### Fifth Defense

CCC cannot prevail against Tractable on its claims of misappropriation, in whole or in part, because Tractable independently developed its AI system. Tractable's unique AI-based technology was developed independent of Tractable's access to CCC ONE or any information it did, or even could have, accessed through its licenses to CCC ONE.

### Sixth Defense

CCC's claims are barred, in whole or in part, because CCC failed to mitigate its alleged damages.

### Seventh Defense

CCC cannot prevail against Tractable on its claims of misappropriation, in whole or in part, because CCC failed to take reasonable measures to guard the secrecy of its trade secrets.

23

### Eight Defense

CCC is not entitled to injunctive relief, because, at a minimum, it has no irreparable injury, it has an adequate remedy at law for Tractable's alleged infringement and/or misappropriation, the balance of hardships does not tip in its favor, and the public interest would be disserved by an injunction.

### Ninth Defense

CCC's claims are barred to the extent they are untimely under the applicable statute of limitations and/or doctrine of laches.

### Tenth Defense

CCC's request for punitive damages violates Tractable's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and the right to protection against excessive fines under the Eighth Amendment to the United States Constitution, and the analogous provisions contained in the Constitution of the State of Illinois.

### Eleventh Defense

CCC cannot recover punitive damages, treble damages, or attorney's fees because CCC is not entitled to any compensatory damages on any of his claims for relief.

### Twelfth Defense

Plaintiff fails to plead fraud with the required particularity.

### Thirteenth Defense

Tractable did not owe a duty to disclose to CCC.

### Fourteenth Defense

CCC's claims are barred, in whole or in part, by the doctrines of estoppel, acquiescence and/or waiver.

**Reservation of Rights**

Tractable reserves the right to assert additional defenses that it may become aware of through the course of discovery.

## COUNTERCLAIMS

Defendant and Counterclaimant Tractable Inc. ("Tractable") brings these antitrust counterclaims for damages, an injunction, and other relief against Plaintiff and Counter-Defendant CCC Intelligent Solutions Inc. ("CCC") and alleges as follows:

## INTRODUCTION

1.      By coercing customers and suppliers into long-term exclusive contracts and blocking or punishing customers for working with technologies other than theirs, CCC has willfully stifled innovation in the market for auto insurance-bodyshop software. This multi-faceted anticompetitive scheme has led to CCC's monopoly and CCC's ability to charge customers prices that are sometimes multiple times more expensive than competing products, because customers are unable to turn to alternative products. CCC and their shareholders have enriched themselves at the expense of everyday Americans, who spend billions a year on auto insurance as a life necessity.

2.      American consumers pay over $360 billion a year to obtain auto insurance. Competition among insurers is fierce, margins are low, and, consequently, inefficiencies in the auto repair process are passed on to consumers in the form of higher prices (*e.g.*, higher premiums, higher deductibles, narrower coverage).

3.      Tractable, an award-winning applied AI company, is helping lead the charge to reduce such inefficiencies by applying artificial intelligence to various aspects of the auto insurance claim process, making the process quicker and more cost effective. This, in turn, makes the auto insurance claim process less painful for consumers and reduces the costs of insurance. Outside the U.S., Tractable's clients include many of the largest insurers, and to date it has helped process over $1

25

billion in auto insurance claims worldwide. Despite this success abroad, in the U.S., Tractable and other companies looking to innovate and improve the auto insurance claims process have hit an anticompetitive wall.

4.      In 2008, software company CCC was poised to secure a monopoly over Estimatics products by acquiring its next-biggest competitor at that time. Although CCC abandoned that merger following a lawsuit filed by the Federal Trade Commission and a preliminary injunction issued by a U.S. District Court, discovery has made clear that CCC did not abandon its monopolistic aspirations. Instead, it pivoted to another anticompetitive strategy to target its competitors and dominate the Estimatics market.

5.      Since its failed merger, CCC has squeezed out its existing rivals and new entrants such that it now has approximately 85% of the Estimatics market, as boasted by its executives. It has achieved this dominance through a multi-faceted anticompetitive scheme, including locking up nearly all of the largest customers into multi-year exclusive contracts. ███████████████████████ ████████████████████████████████████████

6.      Not only does CCC have exclusivity with respect to downstream customers, it has also prevented rivals from gaining access to inputs needed to compete. In particular, CCC entered into a ███████████████ agreement with Hearst for a database of parts and labor data that are critical for Estimatics products. And, to entrench the lockout, CCC's exclusive agreement with Hearst ████████████████████

7.      As a direct result of CCC's anticompetitive conduct, companies that wanted to purchase Tractable's products have been unable to do so. Even in its own documents, CCC acknowledges ██████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████

8.     The advent of CCC's anticompetitive strategy has deprived users of innovative products like Tractable's and made it impossible to constrain CCC's dominance through competition. Today, CCC regularly charges multiple times more than its competitors, yet competitors are unable to compete with CCC on the merits. This translates into increased costs for the users of auto claim software tools due to the lack of choice, as well as reduced innovation in the industry (despite companies, like Tractable, that are ready and willing to provide it), and higher premiums for American consumers.

9.     As one of the excluded competitors trying to reverse that trend and improve the industry, Tractable seeks the damages CCC caused it as a result of its antitrust violations, as well as an injunction from similar acts in the future, so that CCC's long history of anticompetitive behavior finally can be stopped.

## PARTIES

10.     Plaintiff Tractable Inc. is a Delaware corporation with its principal place of business in New York.

11.     Defendant CCC Intelligent Solutions, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because CCC is headquartered within this judicial district. This Court has general jurisdiction over CCC for the same reason.

## FACTUAL BACKGROUND

### I.     The Auto Claim and Repair Process

14.     The first step in the auto claim process is known as the first notice of loss ("FNOL"). FNOL occurs when an insured or claimant informs their insurance company that they suffered a loss as specified in their insurance policy.

15.     In response to a FNOL and in accordance with the adjudication process of a claim, an insurer assigns an individual (an appraiser or an adjuster)[1] to determine liability and coverage.  As part of the claim review process, a determination is made of whether the damage to the vehicle means the vehicle is a total loss or can be repaired (a process known as "triage"). This assists the adjuster in calculating the amount of any claim settlement. The appraiser or adjuster does so by, *inter alia*, assessing the nature and extent of the vehicle's damage, estimating whether the cost to repair exceeds the replacement cost, estimating the costs of repair parts (if a repair is economical), and estimating labor costs.

16.     Historically, most insurers offered their customers three to four different methods of inspection ("MOIs") to assess damages to a vehicle. These methods often include: a direct repair program between insurance companies and certain repair facilities; insurance company staff inspection at the vehicle's location if within a staff member's territory; an inspection performed by an independent appraiser; or a self-service model where the vehicle owner may submit their own photos of a claim.

17.     Today, the various MOIs insurers use will fluctuate based on market preference. Currently there is a push to utilize the MOI that is most conducive to high policyholder satisfaction; with the utilization of technological advancements that make it easier to use software applications

---

[1] "Appraiser" and "adjuster" are used interchangeably throughout these counterclaims.

and tools to perform an appraisal. It is also due to certain contractual arrangements discussed further below.

18. Once an appraisal is complete (and if it does not, based on the insurance company's determination, indicate the vehicle is a total loss), the insurance company will notify the vehicle owner of claim coverage. The vehicle owner will then determine where they want to have the repairs done to their vehicle. This may include the use of a repair facility that is part of an insurers' direct repair network. Once the repairer receives the authorization to repair, the repair facility will determine if there are additional repairs or parts needed. If the shop makes this determination, it needs to seek insurer and vehicle owner authorization for the added repairs or parts. This process is called a "supplement" and relies on similar tools/processes as those an adjuster employed initially in the claim process.

19. Throughout the appraisal and claim process, both the insurer and insured have the option to perform claim reviews; *i.e.*, to review or audit the claim to ensure that it is proceeding according to their satisfaction. There are two types of claim review: (1) the insurer reviews claim information provided by the claims adjuster and/or repair facility, and makes decisions based on that information (*i.e.*, an audit); and (2) the insured can appeal the insurer's decisions during the claim adjustment and repair phases, and seek to change those decisions.

20. Once the appraisal process is complete, the insurer pays the final amount of the claim, a process known as "settlement."

21. Often, the insurance company that handles the claim and approval of the repairs is the insurance company of the vehicle owner, but they were not at fault. In those cases, the insurance company will seek compensation for the repairs from the at-fault individual's insurance company, a process referred to as "subrogation." The two insurance companies in those situations will evaluate the method used to repair the vehicle.

II.     **The Relevant Market at Issue in This Case**

22.     Within the auto claim industry, there are software products that allow industry participants to perform certain tasks throughout the auto claim process.

A.  **Estimatics Products**

23.     Performing partial loss estimations was once a manual process. The appraiser/claims adjuster would perform the calculations either by hand or with a desk calculator. The advent of personal computers and, later, mobile electronics ushered in a new era of estimation of vehicle repair costs with the creation of software products known as "Estimatics." Estimatics products can be used to identify automotive damage, diagnose necessary repairs, and estimate the costs of such repairs. Today, all major automobile insurers use Estimatics software products, as do the vast majority of repair facilities. Estimatics products provide much faster than manual calculations, permit analysis of more kinds of information, and are considered more reliable, consistent, and accurate.

24.     Certain Estimatics products require access to a database of parts and times to replace parts, which are then tracked as line items in a vehicle repair estimate that is based on inputs indicating what is damaged on a particular vehicle. The product's software then uses that and other information to calculate the total cost of repair, taking into consideration overlap times (such as the need to remove a bumper only once to perform two repairs behind or to the bumper). As the sophistication of Estimatics products has grown over the years, so too has the information on which they rely. Whereas such products previously used fairly rudimentary algorithms to calculate repair costs, today—depending on the specific product—they rely on much more complex programming and, as particularly relevant to this dispute, have begun employing artificial intelligence to identify automotive damage, diagnose necessary repairs, and estimate the costs of such repairs.

25.     When compared with other types of software products, Estimatics constitute a distinct product market. Estimatics have a unique purpose—specifically related to auto repair claims—and

other types of software or other products cannot act as a substitute. The automobile-specific data necessary to perform estimations for damaged vehicles means that software created for other industries are not substitutable by users. Furthermore, there is widespread recognition within the auto repair industry that Estimatics are a specific category of software product that have peculiar uses and characteristics and distinct categories of users (insurers and repair facilities). Estimatics are priced independently of other types of software products, and Estimatics purchasers do not cross-compare the prices of other types of software products to estimate repair costs because they are not reasonably substitutable. Customers thus cannot reasonably substitute non-Estimatics software for Estimatics software. A hypothetical monopolist imposing a small but significant non-transitory increase in price of Estimatics software would not cause customers to turn to other non-Estimatics software products.

26.     In November 2008, the Federal Trade Commission filed a complaint in the U.S. District Court for the District of Columbia, seeking to enjoin the proposed merger of CCC and a smaller software company, Mitchell International, Inc. The district court issued a preliminary injunction and temporary restraining order prohibiting the consummation of the merger, and the parties subsequently abandoned the deal. In that litigation, CCC conceded that Estimatics constitutes a relevant product market. *See F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 38-39 (D.D.C. 2009).

27.     As recognized by the district court in *F.T.C. v. CCC Holdings, Inc.*, Estimatics software products are "much faster than manual calculations, permit analysis of more kinds of information, and are considered more reliable, consistent, and accurate" than repair estimates conducted by hand. 605 F. Supp. 2d 26, 31 (D.D.C. 2009). Customers thus cannot reasonably substitute manual estimations for Estimatics software. A hypothetical monopolist imposing a small but significant non-transitory increase in price of Estimatics software would not cause customers to turn to manual estimations or other products.

31

**B. The Relevant Geographic Market**

28.     The geographic market for Estimatics products is the United States. The data in the Estimatics software, including the parts and labor cost and time estimates, are specific to vehicles driven in, and repairs performed in, the United States. Estimatics products sold outside the United States that rely on foreign data thus cannot be used by customers for estimating repair costs in the United States. CCC conceded that the United States constitutes the proper geographic market in the previous FTC enforcement action. *See F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 44 (D.D.C. 2009).

**III.     CCC's Monopoly and Market Power**

29.     Through the anticompetitive conduct alleged more fully below, CCC has steadily gained share over the years and entrenched itself as the dominant seller of Estimatics products. Currently, CCC possesses over 70–80% share of the relevant market. CCC documents state that the company controls 85% of all insurance claims. Indeed, as shown in an interview transcript produced by CCC, CCC's own former executive admitted that CCC is "broaching monopoly territory." CCC touts it is uniquely positioned in the market and "processed more than $1 trillion of historical data across our network."[2]

30.     There are large barriers to entry in the U.S. Estimatics market, both natural and artificial. These include, but are not limited to, (1) the substantial time, expense, and effort required to assemble, edit, and maintain databases related to virtually every vehicle driven in the U.S. as required by customers, to develop and market a communications software platform; (2) reputation and expertise required by customers to operate these systems; and (3) long-term contracts with customers.

---

[2] CCC Intelligent Solutions Holdings Inc. Form 10-K filed February 28, 2024, at 5.

31.     CCC has used its monopoly power to create an artificial barrier to entry by preventing interoperability with competitor products. In particular, CCC originally urged purchasers to adopt its products because they were "open" and could interoperate with other manufacturers' products. CCC, however, changed its stance on that openness once it realized the competitive threat posed by companies like Tractable. More specifically, once it achieved dominance of the Estimatics market, CCC switched its stance and created "closed" products, such that competitors' products could not practically interact with CCC's products or create files that could be ingested into CCC's products without substantial effort, and thus customers could no longer freely choose which products they perceived as best or the best value.

32.     As CCC documents explicitly acknowledge, "it's very tough to break into a market where another player is the dominant one." CCC has increased the limitations on importation of information from non-CCC sources, including by blocking imports of files meeting industry standard specifications—standards that CCC was involved in creating.

33.     Not only does CCC impose barriers to importing data from competing software products, CCC makes it difficult for customers to switch away from its products by claiming ownership of data that its customers enter into its platform, including information and photos that are used to generate claims estimates. The prospect of losing access to this data impedes CCC's customers from working with other Estimatics platforms. Additionally, these barriers make it so that customers are unable to use their own data, which *they generated,* in coordination with third parties, such as Tractable. The contractual restrictions on users' ability to transfer their own information and photos also limits the training sets available for competing AI products, while at the same time CCC preserves its rights to train its products with that very same information generated by their customers.

34.     CCC is able to control prices, such that it can raise prices for its Estimatics products unilaterally without fear of competitors taking market share. The two other Estimatics companies in

the U.S. are much smaller than CCC and have been steadily losing market share to CCC despite providing certain products of similar quality and scope. For example, the prices CCC charges for its products are in some instances multiple times higher than the prices other competitors charge for comparable products, yet CCC continues to gain market share for those products without losing customers—quintessential evidence of monopoly power.

35.     To this point, CCC's financial disclosures show its revenue growth is accelerating, despite its long-term competitors' efforts to compete on price and quality.[3] One such competitor excluded from the market is Tractable in the U.S. due to CCC's anticompetitive conduct.

**IV.     Tractable's Competitive Threat to CCC**

36.     Tractable, founded in 2014, is a startup focused on improving aspects of the insurance industry via artificial intelligence technologies. As a young technology-focused company, Tractable focuses on changing the way auto insurers handle claims by applying AI to accident and disaster recovery. The company's technology looks at the asset damage and predicts repair operations from photos in real time, so that claims can be settled faster. Instead of taking days or even weeks to assess a claim after a car accident, insurers using Tractable can complete the process in minutes. For example, drivers insured by an auto insurer that uses Tractable's technology can upload photos and completely resolve some claims—right down to receiving an offer of payment—in minutes of their first notice of loss.

37.     Tractable enjoys success overseas, particularly in Europe and Asia. Its clients include several of the largest insurers in those regions. Tractable has also received extensive recognition and numerous awards for its breakthrough products, from (among others) the Insurance Post, the Insurance Times, Insurance Insider, CB Insights, and Digital Insurance Agenda. These awards

---

[3] Form 10-K filed February 28, 2024, at 39.

include being named in Deloitte's UK Technology Fast 50; ranking as number two in Sønr Global's Insurtech 100 of 2022; winning "Most Interesting Innovation for Insurance" at Poland's annual Banking Forum and Insurance Forum in 2022; inclusion as one of the 100 leading AI companies in the world in 2020 and 2021 by CB Insights; winning the Best Technology Award in the 2020 British Insurance Awards; being named Best Computer Vision Solution at the 2020 AI Breakthrough Awards; being named 2020 Claims Product Solution of the Year FNOL by the Insurance Times; 2020 Insurance Innovation of the Year and Disruptor of the Year by Insurance Insider' 2020's Best UK Startup by *Startups* magazine; inclusion as a 2020 member of the AI 100 by CBInsights; inclusion as a 2019 member of the FinTech50 (top 50 fintech companies in Europe); inclusion as one of Insurance Post's Top 100 Insurtech firms of 2019; inclusion as one of Digital Insurance Agenda's top insurtechs of 2018; and Digital Insurance Agenda's 2017 Diamond Award. The company continues to rapidly grow in those other regions, but it has been stymied in its efforts to recreate that success in the U.S. due to CCC's anticompetitive conduct. Although U.S. customers have recently expressed interest in purchasing Tractable's products, CCC's anticompetitive acts have precluded those sales.

38.     As relevant to this lawsuit, Tractable offers AI-based damage assessment tools, where in simplistic terms Tractable's AI performs a computer-based visual assessment where the technology acts as if it were an appraiser. Tractable also offers AI-based claim audit/review tools for situations in which a damage assessment has already been created. These can include the review of estimates for ongoing repairs or review of final invoices for completed repairs (such as in the subrogation context). Tractable has for years attempted to sell these products to numerous U.S. entities, but has been blocked from doing so by CCC who has stated that Tractable's products compete with CCC's.

39.     For its part, CCC offers its own "Smart Claims" products to insurers, including but not limited to its Quick Estimate app, noting that "AI-injected tools can instantly identify total loss from repairable vehicles, detect damage and help automate claims, estimating, review and more."

CCC recognizes that "AI solutions" are the wave of the future, and it therefore is currently advertising its development of those solutions as a major selling point of the company.

40. CCC documents produced in this litigation demonstrate that CCC ███████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ As one CCC document succinctly put it: ██ ███████████████████████████████████████████████████████████████

41. Tractable's AI-based Estimatics tools represent a competitive threat to CCC for a variety of reasons, including but not limited to the following.

42. *First*, CCC does not offer sophisticated AI-based tools and is therefore at a competitive disadvantage to companies, such as Tractable, that offer high-quality versions of such tools. If such AI-based tools became commonplace without CCC controlling their proliferation, that would undercut its market dominance.

43. *Second*, CCC historically priced Estimatics products on a per-license basis; *i.e.*, it charged customers a certain amount for each license they obtained, which corresponded to individuals performing appraisals, claim audits/reviews, and related estimations. On the cost side, ████████ ████████████████████████████████████████████████████████████████ AI-based tools greatly increase the number of estimations customers can perform, which has the dual effect of decreasing CCC's revenues (because customers need fewer licenses) and increasing its costs ██████ ███████████████████████████████████████████████████ This means that AI-based tools threaten CCC's profits on a systemic level.

44. *Third*, because AI-based tools, such as those Tractable offers, represent a better, more efficient option for insurers, they threaten CCC's dominance. It is for these and other reasons that

CCC wishes to minimize the proliferation of competitive AI-based tools and has resorted to anticompetitive conduct to do so.

### V.    CCC's Anticompetitive Behavior

45.    CCC's anticompetitive strategy includes two distinct exclusive dealing arrangements—one focused on customers, and the other on data inputs. These individual acts do not proceed in a vacuum; they reinforce each other and magnify the anticompetitive effects of CCC's scheme.

46.    ***Exclusive dealing – downstream customers.*** In 2000, CCC admitted in court filings that "CCC's insurance clients represent the most critical source of CCC revenue." Since then, CCC has not only maintained the vast majority of those relationships, but it has expanded on them and gained ever more insurance company clients at the expense of other rivals. Central to this growth are CCC's exclusive deals with its customers embodied in long-term contracts.

47.    The scope of CCC's exclusive agreements has grown and now foreclose access to at least 70–80% of the relevant market for Estimatics products. In an interview transcript only recently produced by CCC in August 2023 in this litigation, CCC's Former Vice President of Product Development said, "CCC had 23 of the top 25 carriers in North America. . . . Everyone else is pretty much CCC-exclusive at this point." Tractable only became aware of the scope of CCC's exclusivity agreements—in terms of both their reach within the market and term length—recently as a result of discovery in this litigation.

48.    And the exclusivity is not limited to just Estimatics products. CCC has continually grown and expanded its product offerings all sold under the CCC ONE brand, and considers as competitors anyone who offers anything similar to any one of its offerings. CCC ONE is in effect an amalgamation of products, at the core of which sits the CCC Estimatics products. So CCC's exclusivity clauses are not limited to just blocking competitors for their core Estimatics products, but

to numerous other companies who attempt to compete with CCC. As time goes on, the scope of excluded companies, services, and technologies continues to grow.

49.     Documents produced in this litigation show that ███████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

50.     While insurance companies are the largest and most competitively important purchasers of Estimatics products, CCC's exclusivity impacts auto repair facilities as well.  Repair facilities are often expressly required to use CCC products if they want to participate in lucrative partnerships with insurance carriers, called Direct Repair Programs ("DRPs").

51.     As CCC's former executive explains in a document produced by CCC, "You want to be what's in the insurance industry to have what's called DRPs or direct repair programs, which is where a carrier may sign specific contractual agreements with, say, 5,000 repair facilities in North America to say if I send you my [] claim, you will charge me these rates and you'll use these parts and you'll see these providers and all these various procedures. So if you're a repair facility, you watch [the carrier's] business, you need to be in CCC's network and, very likely, you need to run CCC's software in your repair facilities as well."

52.     For example, CCC documents also show that ██████████████████████████ are required to use CCC products.  As yet another example, ████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████ As CCC's former executive put it, CCC requires its insurance company to issue a "Thou shalt use CCC" mandate to its repair facilities

to further entrench CCC's monopolistic hold in the market. While CCC has, to date, refused Tractable's discovery requests for the remainder of its agreements other than its ██████████ ██████ CCC's practice of using of long-term, exclusive agreements with its customers to solidify CCC's monopolistic position in the market is now clear from the ████████████████ and statements made by CCC's former executives found in other CCC documents produced in this litigation.

53.     Moreover, repair facilities must have access to the software that the insurance companies exclusively use, or else lose a significant portion of their business (or suffer a competitive disadvantage) as well. As explained in a transcript from an interview with CCC's former executive that CCC produced in August 2023, "[I]f you are a repair facility, well, CCC had 23 of the top 25 carriers in North America. . . . Everyone else is pretty much CCC-exclusive at this point. If you're a repair facility, and certainly for a multisite operator, you want to be in that one." In other words, CCC's express and *de facto* exclusive deals make it economically infeasible for repair facilities to purchase non-CCC Estimatics products.

54.     Separately and combined, CCC's exclusive arrangements substantially foreclose sales to purchasers of Estimatics products. There are no feasible alternative sales outlets for competing Estimatics companies.

55.     CCC maintains and expands its exclusive dealing through coercion. Specifically, although customers would prefer to purchase competing Estimatics products, CCC ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████

56.     The intended impact of CCC's anticompetitive behavior was not lost on CCC. As part of ████████████████████████ documents produced in August 2023 by CCC show that its

39

executives explicitly discussed ██████████████████████████████████████

████████████████████████████████ CCC strategy PowerPoint further discussed ██████████

██████████████████████████████████████████████████████████████

57. ***Exclusive dealing – upstream data inputs.*** In addition to exclusive deals with downstream customers, CCC has further cemented its market dominance by deliberately locking up inputs needed by Estimatics competitors.

58. One instance of input exclusivity involves CCC's exclusive agreement with Hearst for the Motor database—the only available industry-accepted source of auto parts and labor data in the U.S. The Motor database covers more than 95% of all automobiles in the U.S. market and includes parts data on all major makes and models of vehicles sold in North America, including historical information for many years. Among other information, the database also has comprehensive information on labor times and costs, which is the result of an enormous number of expert-supervised time studies.

59. CCC entered into an exclusive license for the Motor database and persists in maintaining that exclusivity to this day. Under the terms of their license agreement, Hearst is

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████ Tractable first became aware of the scope of this arrangement through documents produced in this litigation.

60. As noted previously, any Estimatics provider *must* have access to a parts and labor database in order to provide a competitive product. This is because reliable estimates and claim audits/reviews depend on up-to-date and accurate part costs, reliable labor estimates, and other information in the Motor database. By precluding access to the only available example of such a database, CCC prevents new entry, stifling innovation and harming competition as a result. The only

other competitors with access to similar databases are Audatex and Mitchell, but their databases are proprietary and not made available to competitors; *i.e.*, they are captive databases.

61.     A new entrant without access to an existing database cannot simply create one of its own in order to compete. To create a credible database that auto repair industry participants can trust and use for their claims estimates and analyses, a new entrant would need to regularly perform highly resource-intensive tasks, such as data revisions and time studies, by using parts data from the original equipment manufacturers (*i.e.*, car manufacturers), and continually update and refine its data. As the U.S. District Court found when enjoining CCC's merger with a smaller rival in 2009, "[i]t would take a number of years, untold thousands of man-hours, and millions of dollars of investment to create and maintain a competitive parts and labor database." *F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 51 (D.D.C. 2009). Such a task is not commercially possible for a new entrant that wishes to compete effectively (or at all) in the relevant markets. The Motor exclusive deal thus helps maintain CCC's dominance.

62.     Access to the Motor database is critical for competition in the relevant markets. Indeed, in the FTC's 2009 merger challenge, CCC offered to "relinquish its exclusive rights to license Hearst's Motor database, allowing any competitor or entrant the opportunity to obtain immediate access to a comprehensive, fully updated database of parts and services." *F.T.C. v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 51 (D.D.C. 2009). CCC argued that "this renewed open access to the Motor database" would help spur competition and allow access to new entrants, because they would have access to a critical input for competing products in the relevant markets. However, because the FTC succeeded in enjoining CCC's merger at that time, CCC never relinquished its exclusive control over the Motor database. Instead, ███████████████████████████████████████████████ ███████████ to solidify its market dominance in combination with the other anticompetitive conduct described herein.

41

## VI.     The Anticompetitive Effects of CCC's Conduct and Tractable's Resulting Injury

63.     CCC's anticompetitive conduct harms competition by excluding rivals, substantially foreclosing access to the market, and restraining customers from doing business with CCC's competitors, including Tractable. These acts have increased over time as CCC has gained ever more market share in the U.S. and, today, they artificially (and intentionally) cement CCC's dominance and power.

64.     The cumulative effect of CCC's anticompetitive scheme has been to entrench its dominance in the relevant market for Estimatics products such that competitors are unable to take market share away from it by virtue of lower prices, higher-quality or more innovative products, increased choice between product features or types, higher output for their products, or any other procompetitive tactic.

65.     Compounding the anticompetitive effects, insurers often need to benchmark their repair key performance indicators ("KPIs") with their competitors' KPIs, so they can assess how best to underwrite and assess risk. As the dominant Estimatics product provider in the U.S., CCC has the most comprehensive set of benchmarking data available for insurers. It has used that position to bolster its dominance by insisting on and obtaining exclusive deals. This means that insurers must commit to and remain with CCC's products to have access to this benchmarking data, or otherwise be at a competitive disadvantage to their main competitors. CCC's use of its benchmarking data in this way thus erects another barrier to new entry.

66.     Tractable has personally suffered in terms of lost contracts, lost opportunities with customers, lost profits, and substantial diminution in its enterprise value as a result of CCC's anticompetitive conduct.

67.     In particular, despite offering products that are of higher quality than CCC and desired by customers—as demonstrated by its substantial success overseas, in markets that CCC does not

dominate—Tractable is unable to draw away CCC customers in the U.S. due to the interrelated exclusionary practices detailed herein.

68. Customers have been directly prevented from purchasing Tractable's superior Estimatics products because of CCC's anticompetitive conduct. For example, a CCC document

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

69. CCC leadership have specifically attributed its market dominance to CCC's exclusive agreements. As CCC documents show, a former CCC executive admitted "insurance carriers, they would love to have another option." Yet as long as CCC's anticompetitive conduct continues unabated, they cannot.

## **FIRST CLAIM FOR RELIEF**

### **(Sherman Act, Section 1, 15 U.S.C. § 1)**

70. Tractable repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

71. As alleged above, CCC and customers have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power for CCC in the relevant market for Estimatics products in the United States.

Exclusive dealing arrangements with customers

72. CCC has entered into long-term exclusive dealing arrangements with customers with respect to the provision of Estimatics products.

73. CCC's arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

74.     CCC's arrangements cannot be circumvented.

75.     CCC's arrangements with customers are of long duration and not easily terminable as a matter of practical economics.

76.     CCC has coerced customers to enter into these arrangements.

77.     CCC's arrangements are not the product of competition.

78.     CCC's arrangements have had the effect of substantially lessening competition in the relevant market.

<u>Exclusive dealing arrangements with Hearst</u>

79.     CCC has entered into ██████████████████████ with Hearst with respect to access to the Motor parts and labor database, which is a necessary input for products within the relevant market.

80.     CCC's arrangement has had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

81.     CCC's arrangements cannot be circumvented.

82.     CCC's arrangement with ████████████████████████████████ ████████████████

83.     CCC has coerced Hearst to remain in this arrangement.

84.     CCC's arrangement is not the product of competition.

85.     CCC's arrangement has had the effect of substantially lessening competition in the relevant market.

86.     CCC's conduct has no legitimate business purpose or procompetitive effect.

87.     There are less restrictive alternatives to the restraints CCC imposed on the relevant market.

88.     CCC's conduct has had a substantial effect on interstate commerce.

89.     Tractable has been or will be injured in their property as a result of CCC's conduct.

90.     Tractable has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Tractable has been and will be injured by the harm to competition as a result of CCC's conduct.

## SECOND CLAIM FOR RELIEF

### (Monopolization, Sherman Act, Section 2, 15 U.S.C. § 2)

91.     Tractable repeats and realleges each and every allegation of this Complaint as if fully set forth herein.

92.     CCC possesses monopoly power in the relevant markets for Estimatics products in the United States. CCC has the power to control prices or exclude competition in the relevant market.

93.     CCC has market share of at least 70–80% of the relevant market.

94.     CCC has willfully acquired and maintained monopoly power by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to long-term exclusive dealing arrangements, as alleged herein.

      Exclusive dealing arrangements with customers

95.     CCC has entered into long-term exclusive dealing arrangements with customers with respect to the provision of Estimatics products.

96.     CCC's arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

97.     CCC's arrangements cannot be circumvented.

98.     CCC's arrangements with customers are of long duration and not easily terminable as a matter of practical economics.

99.     CCC has coerced customers to enter into these arrangements.

100.    CCC's arrangements are not the product of competition.

101.    CCC's arrangements have had the effect of substantially lessening competition and tending to create a monopoly in the relevant market.

<u>Exclusive dealing arrangements with Hearst</u>

102.    CCC has entered into ███████████████████████████ with respect to access to the Motor parts and labor database, which is a necessary input for products within the relevant market.

103.    CCC's arrangement has had the effect of foreclosing competition in a substantial share of the line of commerce affected in the relevant market.

104.    CCC's arrangements cannot be circumvented.

105.    CCC's arrangement with Hearst is ██████████████████████ ██████████████████

106.    CCC has coerced Hearst to remain in this arrangement.

107.    CCC's arrangement is not the product of competition.

108.    CCC's arrangement has had the effect of substantially lessening competition and tending to create a monopoly in the relevant market.

109.    CCC's conduct has no legitimate business purpose or procompetitive effect.

110.    There are less restrictive alternatives to the restraints CCC imposed on the relevant market.

111.    CCC's conduct has had a substantial effect on interstate commerce.

112.    Tractable has been or will be injured in their property as a result of CCC's conduct.

113.    Tractable has suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Tractable has been and will be injured by the harm to competition as a result of CCC's conduct.

## JURY DEMAND

114.    Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Tractable demands a

jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Tractable requests the following relief:

a.    Damages in an amount to be determined;

b.    Treble damages;

c.    Attorneys' fees;

d.    Costs;

e.    Pre-judgment and post-judgment interest at the maximum rate permitted under

the law;

f.    Injunctive relief, including but not limited to an injunction barring Defendants'

conduct alleged in the Complaint;

g.    Declaratory relief, including but not limited to a declaration and judgment that

CCC's conduct alleged in the Complaint violates the laws alleged in the Complaint; and

h.    Such other and further relief as the Court deems proper and just.

DATED: March 11, 2024        Respectfully submitted,

KING & SPALDING  LLP

*/s/ Lazar P. Raynal*
Lazar P. Raynal (Bar No. 6199215)
Michael A. Lombardo (Bar No. 6334886)
KING & SPALDING LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
lraynal@kslaw.com
mlombardo@kslaw.com

Julia C. Barrett (*pro hac vice*)
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, Texas 78701
Telephone: (512) 457-2000
jbarrett@kslaw.com

Robert M. Cooper (*application pending*)
Christopher C. Yook (*application pending*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, DC 20006
rcooper@kslaw.com
cyook@kslaw.com

*Attorneys for Defendant and Counterclaimant Tractable Inc.*